**Sealed**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

FILED by __RAL__ D.C.

OCT 1 0 2013

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES OF AMERICA and )
THE STATE OF FLORIDA ex rel. )
Thomas Bingham, )
    )
            Plaintiffs, )
    vs. )
    )
HCA, Inc., )
    )
            Defendant. )
    )
    )
_____ )
    )

**FILED UNDER SEAL**

# 13-23671
## CIV - COOKE
### MAGISTRATE JUDGE
### TURNOFF

**COMPLAINT**

*Qui tam* Plaintiff Thomas Bingham ("Bingham"), by and through his attorneys, brings this Complaint on behalf of the United States and the State of Florida and on his own behalf, pursuant to 31 U.S.C. §3730 of the Federal False Claims Act and the Florida False Claims Act, Fla. Stat. Ann. §68.081 *et seq.*, based on the defendant's payment of unlawful remuneration to referring physicians in violation of the Stark Law and the Anti-Kickback Statute.

-1-

# I.

## INTRODUCTION

1.      This Complaint is brought against HCA (aka "Hospital Corporation of America")
acting through various of its wholly owned entities. In January 2001, HCA entered into a
Corporate Integrity Agreement with the Office of Inspector General of the Department of Health
and Human Services as part of a settlement of certain fraud proceedings against HCA which
alleged that HCA had provided compensation to referring physicians in violation of the
Anti-Kickback Statute and the Stark Statute. The agreement, which expired on January 24, 2009,
was designed, in part, to raise awareness of these laws and various regulatory issues among HCA
employees and provided that further violations applicable to space lease transactions between
HCA hospitals and healthcare providers could result in civil monetary penalties and criminal
liability, including substantial fines and penalties. The allegations in this Complaint demonstrate
that HCA did not end the practices that led to the proceedings culminating in the Corporate
Integrity Agreement.

2.      The Complaint alleges that HCA purposefully employed a confusing trail of
complex real estate transactions in the development of a Medical Office Building (MOB) on one
of its hospital campuses to conceal unlawful remuneration and non-monetary compensation paid
to referring physicians and did so during the period in which the Corporate Integrity Agreement
remained in effect. As alleged herein, the mechanics of this scheme include a 99 year ground
lease of hospital campus property at less than fair market value, the construction of an
on-campus MOB on the leased ground, a MOB developer ground lessee organized as a Limited
Liability Limited Partnership (LLLP), the concealment of the actual financial terms of the
ground lease, the concealment of the identities of the limited partners of the LLLP, the grant of
overly generous long term on-campus easement and parking rights as part of the ground lease,
the leasing of unused shell space by HCA in the LLLP-built and owned MOB and the subsequent
sale of the LLLP owned on-campus MOB, along with the ground lease and easements, to a third
party at a substantial profit.

-2-

## II.

## JURISDICTION AND VENUE

3.       This is an action for civil damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*("FCA") and the Florida False Claims Act, Fla. Stat. Ann. §68.081 *et seq.* ("FFCA"). This court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and (b) and supplemental jurisdiction pursuant to 28 U.S.C. § 1359. The court has personal jurisdiction over the defendant because the defendant transacts business and can be found in this district and the defendant committed acts within this district that violate 31 U.S.C. § 3729 as alleged herein.

4.       Venue is proper in this district under 31 U.S.C. § 3732(a) because the defendant can be found and transacts business in this district.

## III.

## PARTIES

5.       *Qui Tam* Plaintiff Thomas Bingham is a Certified General Real Estate Appraiser in the State of Tennessee, Tennessee Certification No. 229.   Bingham resides in Nashville, Tennessee.   Most of Bingham's workload as an appraiser consists of conducting market rent/Fair Market Value ("FMV") studies. Bingham has employed his special skills as a commercial real estate appraiser in uncovering the fraud scheme alleged in this complaint.

6.       Defendant HCA, Inc. ("HCA"), is a Delaware Corporation with its principal executive offices located at One Park Plaza, Nashville, Tennessee 37203. HCA is the leading health care services provider in the United States, comprised of approximately 191 hospitals and 82 outpatient surgery centers in 23 states, England and Switzerland. HCA owns and, through its East Florida Division, operates the Aventura Hospital and Medical Center (AHMC) which includes the Aventura Hospital, a 407 bed for-profit general medical and surgical hospital in Aventura, Florida. HCA also owns and operates the Miami Beach Healthcare Group, Ltd., through its wholly owned entity, the Columbia Hospital Corporation of Miami Beach. Bingham

is informed and believes and herein alleges that the HCA East Florida Division, the Miami Beach Healthcare Group, Ltd., the Columbia Hospital Corporation of Miami Beach, Aventura Hospital and AHMC are mere instrumentalities of HCA. The claims made against HCA as alleged herein are made against HCA and its instrumentalities. The actions of HCA's instrumentalities are the actions of HCA.

## IV.
## THE LAW

### The False Claims Act

7.      The False Claims Act prohibits the submission of false or fraudulent claims and false statements in order to obtain or keep federal money. It   provides, in pertinent part:

(1) Any person who (A) knowingly presents, or causes to be presented, to an officer, agent, contractor or employee of the United States Government of the United States a false or fraudulent claim for payment or approval; or (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

* * *

is liable to the United States Government for a civil penalty of not less than $5000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . ., plus 3 time the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a).

### The Florida False Claims Act

8.      The Florida FCA prohibits the submission of false or fraudulent claims and false

-4-

statements to state agencies in order to obtain or keep state money. It   provides, in pertinent part:

(2) Any person who:

(a) Knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval; or

(b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;

***

is liable to the state for a civil penalty of not less than $5500 and not more than $11000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

9.     Both the FCA and the Florida FCA define "knowingly" as follows:

(1) the terms "knowing" and "knowingly"

(A) mean that a person, with respect to information-- (I) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and no proof of specific intent to defraud is required.

**The Anti-Kickback Statute (AKS)**

10.     The AKS, 42 U.S.C. § 1320a-7b(b), prohibits, among other things, paying kickbacks to induce referrals for services paid under federal health care programs. The AKS arose out of Congressional concern that payoffs to those who can influence healthcare decisions corrupt professional healthcare decision-making and may result in federal funds being diverted to pay for goods or services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. The AKS prohibits payment of kickbacks in order to protect the integrity of the federal health care programs from these difficult to detect harms. First enacted in 1972, the AKS was strengthened in 1977 and 1987 to ensure that kickbacks masquerading as

legitimate transactions do not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

11.     The AKS prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical items and services, including items and services provided under the Medicare program, state Medicaid and Tricare, among others. In pertinent part, the statute states:

> (b) Illegal remuneration
>
> * * *
>
> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) <u>directly or indirectly</u>, overtly or covertly, in cash or in kind to any person to induce such person-
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not

more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2). Violation of the statute can also subject the perpetrator to exclusion from participation in federal health care programs and civil monetary penalties of up to $50,000 per violation and up to three times the amount of remuneration paid. 42 U.S.C. § 1320a-7b(7); 42 U.S.C. § 1320a-7(a)(7). Additionally, a claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the False Claims Act. 42 U.S.C. § 1320a-7b(g).

## The Stark Statute

12.     42 U.S.C. § 1395nn (commonly known as the "Stark Statute" or "Stark II") prohibits hospitals and certain other designated health services (DHS) providing healthcare items and services from submitting Medicare claims for payment for items and services that are the product of patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital or DHS. The Stark Statute requires that the Medicare program deny payment for claims for any service billed in violation of its provisions. 42 U.S.C. § 1395nn(g). In addition, it requires that providers who have collected Medicare payments for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353. The Stark Statute establishes the presumptive rule that providers may not bill and the Medicare program will not pay for designated health services (as defined in the statute) generated by a referral from a physician with whom the provider has a financial relationship. 42 U.S.C. §§ 1395nn(a)(1),(g)(1). The Statute was designed to protect the federal healthcare programs from paying for the costs of questionable utilization of services by removing monetary influences on referral decisions.

13.     At all times relevant to this Complaint, the Stark Statute has applied to payments to referring physicians by hospitals and the resulting claims to the Medicare program. *See* 42 U.S.C. §§ 1395nn(h)(6)(K). In pertinent part, the Stark Statute provides as follows:

(a)     Prohibition of certain referrals

(1)     In general

Except as provided in subsection (b) of this section, if a physician
(or an immediate family member of such physician) has a financial
relationship with an entity specified in paragraph (2), then–

> (A) the physician may not make a referral to the entity for
> the furnishing of designated health services for which payment
> otherwise may be made under this subchapter, and
>
> (B) the entity may not present or cause to be presented a claim
> under this subchapter or bill to any individual, third party payor,
> or other entity for designated health services furnished pursuant
> to a referral prohibited under subparagraph (A).

42 U.S.C. §§ 1395nn.

14.     The Stark Statute broadly defines covered financial relationships to include any
"compensation" paid directly or indirectly to a referring physician. 42 U.S.C. § 1395nn(a)(2). [1]
Hospitals are prohibited from billing the Medicare program for designated health services

---

[1]   An indirect financial relationship exists if, *inter alia*, there is an indirect compensation
arrangement between the referring physician and an entity that furnishes services. An indirect
compensation arrangement exists if, inter alia, the referring physician receives aggregate
compensation that "varies with, or takes into account, the volume or value of referrals or other
business generated by the referring physician for the entity furnishing" services. *42 C.F.R. §
411.354(c)(2)(ii).*   Such an arrangement further requires an "unbroken chain" between the
referring physician and the entity furnishing the services, and the entity must have knowledge or
act in reckless disregard of the fact that the physician receives compensation that varies with or
takes into account the volume or value of referrals. *42 C.F.R. § 411.354(c)(2).*

provided to patients referred by a physician with whom the hospital has a financial relationship or "compensation arrangement," unless an express statutory or regulatory exception for the financial relationship applies. *See* 42 U.S.C. §§ 1395nn(a),(b).   Compensation arrangements include any arrangement involving any remuneration between a physician and an entity, directly or indirectly, overtly or covertly, in cash as well as in-kind transfers of benefits for a cost other than fair market value. Most of the exceptions under the Stark Statute parallel the regulatory and statutory exceptions to the AKS. *See* 42 C.F.R. § 1001.952.

15.     A leasing arrangement would not be considered a "compensation arrangement" paid to a referring physician and would therefore be considered an exception to the Stark prohibitions if all of the following criteria are met: (1) the lease is set out in writing, signed by the parties, and specifies the premises covered by the lease; (2) the space rented or leased does not exceed that which is reasonable and necessary for the legitimate business purposes of the lease or rental and is used exclusively by the lessee; (3) the rental charges over the term of the lease are set in advance, are consistent with fair market value("FMV"), and are not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties; and (4) the lease would be commercially reasonable even if no referrals were made between the parties. Conversely, the following would constitute compensation arrangements or remuneration falling under the referral prohibitions of the Stark Statute and the AKS if provided by a designated health service to a referring entity:   providing free office or commercial space; leasing space at rates below fair market value; granting unusual concessions which are not consistent with prevailing market terms; leasing unused space from a referring source and paying excessive rents to a referral source.

## V.

## TRANSACTIONAL BACKGROUND

16.     The life blood of hospitals is the steady flow of physician referred patients. In

-9-

order to maintain and increase the number of physician referred patients, hospitals have increasingly employed a variety of creative and oftentimes complex means, legal and illegal, to encourage and increase patient referrals from physicians.

17.    One of the more complicated means increasingly used by hospitals over the last decade to encourage and increase the number of physician referred patients is the use of ground leases to develop and construct medical office buildings on hospital campuses. In a typical scenario designed to locate the offices of referring physicians in close proximity to the hospital in order to increase patient referrals, the hospital will enter into a long term ground lease with a developer to construct a Medical Office Building (MOB) on an undeveloped portion of the hospital campus. Although the MOB that is built on the leased land belongs to the developer, by entering into a long term ground lease of the property upon which the MOB sits, instead of selling it, the hospital is able to maintain some control over the MOB, including restricting qualified tenants to physicians with hospital privileges and prohibiting medical uses that compete with services offered by the hospital. The hospital is also able to provide the MOB developer, as part of the deal, easements to other parts of the hospital campus to be used in connection with the MOB, such as parking facilities, walkways and utilities and other incentives and benefits designed to encourage and increase the referral of patients from the MOB physician tenants to the hospital.

18.    Because the ground lease scenario normally involves several inter-related, cross-referencing and complicated real estate transactions, it can be easily manipulated to conceal any unlawful compensation arrangements that are built into the different stages of the related transactions. Except for minor differences between campuses, HCA and a Boca Raton based MOB development company, the Greenfield Group, Inc., have developed a relatively consistent ground lease/MOB model that they have jointly implemented at various hospital campuses, including HCA's hospital campus at Aventura, Florida, that conceals unlawful compensation arrangements to increase physician referrals.

19.    The mechanics of the ground lease scenario that are typical of HCA's model

-10-

include the following features: a) A long-term ground lease (e.g. 50-99 years) entered into with the MOB developer organized as a limited partnership to construct and own the MOB on a leased undeveloped parcel of HCA's hospital campus that is only slightly larger than the anticipated ground space upon which the MOB will be constructed;   b) The recording of only a summary of the ground lease between HCA and the MOB developer/owner which conceals the financial terms of the ground lease, including the amount of lease payments to be paid to HCA by the MOB developer/owner for the ground lease; c) The formation of the limited partnership by the Greenfield Group, or one of its shell corporations, which serves as the general partner; d) Public disclosure of only the identity of the non-physician general partner of the limited partnership, while concealing the identities of the limited partners, which include referring physicians; e) Long-term (5-10 year)   medical office leases of MOB space between the limited partner referring physicians and/or their group practices (as tenants) and the limited partnership owner of the MOB (as landlord); f) Leasing of unused MOB shell space by HCA; and g) A long term parking easement onto adjacent HCA built parking facilities for the life of the ground lease that runs with the land granted by HCA to the MOB developer/owner sufficient in size and duration to permit the MOB developer/owner to satisfy all regulatory/zoning parking space requirements for the MOB's dimensions without having to incur the additional cost of constructing parking facilities to service the MOB, that provides the MOB's referring physician/tenants and their staff free parking and which significantly boosts the value of the MOB as collateral for financing and subsequent refinancing or sale. The boosted value of the MOB can be roughly measured by the cost to HCA of constructing and maintaining parking facilities adequate to satisfy the parking requirements of the MOB for the life of the ground lease.

## VI.

### FIRST CLAIM FOR VIOLATION OF THE FCA
### (31 U.S.C. §§ 3729(a)(1)(A) & (B)) AGAINST HCA

20.     Plaintiffs repeat and reallege paragraphs 1 through 19 as if fully set forth herein.

21.     The Aventura Hospital is a for profit acute care hospital located at 20900 Biscayne Boulevard, Aventura, Florida   that provides inpatient and outpatient services to a large number of patients covered by federal and state sponsored health care programs, including Medicare (provider I.D. # 100131), Medicaid, and Tricare, with an average inpatient stay of 5.81 days. Staffed by more than 700 physicians, the Aventura Hospital is a designated health service for purposes of the Stark statute. At all times herein alleged, AHMC and HCA knew that the Aventura Hospital was not permitted to submit claims for payment to Medicare, Medicaid, TriCare or other federally sponsored health care programs for services provided to any patient that had been referred by a physician with whom HCA and AHMC had either a direct or indirect financial relationship which did not fall under an exception in the Stark Statute and AKS. At all times herein mentioned, the Aventura Hospital submitted periodic cost reports to Medicare and Medicaid that certified that it was in compliance with the provisions of the Stark Statute and the AKS.

22.     AHMC's main campus consists of the Aventura Hospital, several free standing medical office buildings and two multi-level parking garages.   Aventura Hospital's facilities were upgraded/expanded approximately ten years ago. The $130 million upgrade and expansion project included a nine-story, 146-ft. tower that includes 245 private rooms, a 26-bed emergency department, two intensive-care units and 10 new operating rooms. The project also included a parking garage and renovation to the existing building. The six-story, 815-space parking garage, which opened in November 2001, had to be built before construction of the tower could start. As part of Aventura Hospital's upgrades/expansion, an open-heart surgery program was established along with improvements to the cardiac care services at the hospital. This required an approval of a Certificate of Need by the State of Florida along with an approximate $8.55 million investment on the second floor of the nine-story hospital tower.

23.     Aventura Heart and Health Building. The Aventura Heart & Health Building (aka

-12-

and previously called the Aventura Medical Arts Building) is a five-story, approximately 100,000 rentable square feet (104,875 gross square feet) multi-tenant MOB built in 2005-06 in the northwest corner of AHMC campus at NE 211 Street and NE 28th Avenue on the west (rear) side of the Aventura hospital. It has a street address of 21097 NE 27th Court and is located on a parcel identified by the Miami-Dade County Office of Property Appraiser as 28-1234-005-0915.

24.     According to the zoning map for the City of Aventura, AHMC is zoned MO (Medical Office). Non-residential development in the Aventura MO district is subject to a maximum base floor area ratio (FAR) of 2.0. Based on the MO district regulations, the required lot size for the 104,875 gross square feet Aventura Heart and Health Building is at least 52,438 square feet or 1.204 acres. Additionally, because the City of Aventura's Off-street Parking Standards require one parking space per 300 square foot area (3.33 spaces per 1,000 square feet) for medical office uses, the number of parking spaces required to service the Aventura Heart and Health Building, based on its size, is approximately 350 — surfaced or structured (104,875 SF / 300 SF per space). It is not feasible to construct a five story medical office building containing 104,875 gross square feet on a 52,438 square foot site that also includes a minimum of 350 above-ground parking spaces.

25.     As a pre-requisite to obtaining site plan approval from the City of Aventura for AHMC's anticipated MOB development plans, in July 2002, HCA, through its wholly owned entity Miami Beach Healthcare Group, Ltd., executed a non-exclusive cross-parking agreement granting to all present and future owners and tenants, including their employees, agents, guests and invitees, a non-exclusive right to use all parking spaces at AHMC, excluding the hospital. Pursuant to its terms, the Non-Exclusive Cross Parking Agreement was intended as a covenant to run with the land, it was not a dedication of AHMC's  parking and easement areas to the general public and it only became effective when recorded in the public records of Miami-Dade County, Florida. HCA did not record the Non-Exclusive Cross Parking Agreement until October 15, 2005, after the construction of the Aventura Heart and Health Building commenced in the Spring of 2005.

26.     Between approximately July 2002 and January 2003, HCA recruited the

Greenfield Group to serve as its consultant for the MOB development project and to organize a limited partnership to build and own the Aventura Heart and Health Building consistent with HCA's ground lease/MOB model. Thereafter, on or about February 11, 2003, the Greenfield Group on behalf of Miami Beach Healthcare (HCA) submitted an application for site plan and variance approval to the City of Aventura to construct the 5-story, 103,415 square foot medical office building and an adjacent six-story detached stand-alone parking structure with1,042 parking spaces. The project was broken into two phases. The parking garage would be built in Phase I. The MOB would then be built in Phase II, after the garage was completed to ensure that "parking spaces in excess of the number required by City Code will be available for the new medical office building . . . ." HCA's site plan was approved by the Aventura City Commission on May 6, 2003, in Resolution 2003-43. The Phase I construction of the six-story stand-alone parking structure commenced and was thereafter completed prior to April 2005, when the Phase II construction of the MOB commenced. The estimated cost of constructing the parking structure was approximately $15-20 million. The proportional estimated cost of the 350 above-ground parking spaces necessary to ensure "that parking spaces in excess of the number required by [the] City Code" were available for the new medical office building was approximately $5.25 million.

27.     On June 21, 2004, William R. Greenfield ("Greenfield"), owner of the Greenfield Group, formed RTH Equity, LLC, a wholly owned Greenfield Group entity. In turn, on June 22, 2004, RTH Equity, LLC, formed RTH Partners, LLLP, with RTH Equity, LLC, listed as its general partner. As of June 2004, the registered address for the Greenfield Group, RTH Equity, LLC, and RTH Partners, LLLP, was the same address at 2300 Glades Rd, Ste 100E, Boca Raton, Florida.[2]

28.     In pre-coordinated fashion, at exactly 12:16 p.m. on April 12, 2005, all of the

---

[2] As of September 2013, the Greenfield Group had formed more than approximately 40 different limited liability partnerships which list the same business address on Glades Road in Boca Raton, Florida.

-14-

following documents were simultaneously recorded in the public records of Miami-Dade County, Florida:

> a) <u>Memorandum of [Ground] Lease Agreement ("Memorandum")</u>

> Landlord:   Miami Beach Healthcare Group, Ltd. (HCA)

> Tenant:    RTH Partners, LLLP

> Book/Page:   23272/338

(1) The recorded Memorandum is a summary of some of the basic terms of an unrecorded Ground Lease between Miami Beach Healthcare Group, Ltd., and RTH Partners, LLLP, showing that the lease commenced on April 12, 2005 for a term of 99 years. The Memorandum included a description of the premises which showed that the boundaries consisted of a tract containing approximately 37,945 square feet (0.871 acre), the land upon which only the physical structure of the Aventura Heart and Health Building would be constructed (the "MOB Parcel"), with no ground space allocated for parking or the construction of parking facilities. It also reflected a contemporaneous grant by the landlord of easement rights created for the benefit of the owner of the MOB Parcel set forth in a simultaneously recorded Declaration of Covenants, Restrictions and Easements. The financial terms of the 99 year Ground Lease, including the amount of the lease payments to be made by the tenant, were not disclosed in the Memorandum. The recorded Memorandum was signed by Greenfield on behalf of RTH Equity, LLC, as the General Partner of RTH Partners, LLLP. The identities of the limited partners of RTH Partners, LLLP, were not disclosed.

> b) <u>Declaration of Covenants, Restrictions and Easements ("Declaration")</u>

> Declarant: Miami Beach Healthcare Group, Ltd. (HCA)

> Book/Page:   23272/0295

(1) The Declaration identifies both the MOB Parcel and a Development Parcel, which are both owned by the Declarant (Miami Beach Healthcare Group, Ltd.). The MOB Parcel is identified as the land area subject to the Ground Lease.   The Development Parcel lies adjacent to the MOB Parcel and currently includes the six-level parking garage (which was built by HCA in conjunction with the construction of the Aventura Heart and Health Building) as

well as most of the balance of the Aventura Hospital campus (excepting the hospital facility and two medical office buildings located south of the MOB Parcel and the 6-level parking garage). The Declaration defined the MOB Parcel Owner as the owner of the fee simple title to the MOB Parcel, which was Miami Beach Healthcare Group, Ltd., and any ground lease tenant/lessee if the ground lease was for a term of 50 years or more, until the expiration or termination of the lease. The Declaration defined the Development Parcel Owner as the owner of record of the fee simple title to the Development Parcel, which is Miami Beach Healthcare Group, Ltd.

(2) The Declaration restricted the use of the MOB Parcel to the construction, maintenance and operation of a medical office building (the Aventura   Heart and Health Building) of not more than 100,000 rentable square feet to be used and occupied as medical offices for licensed physicians, restricted the type of medical services provided by the physician tenants to those which do not generally compete with the medical services provided by the Aventura Hospital and required that all physician tenants, at the time they first took occupancy of any part of the MOB, be qualified to be members of the active medical staff of the Hospital.

(3) In the Declaration, HCA granted to the MOB Parcel Owner (which included both the Ground Lease Landlord/Lessor and the Ground Lease Tenant/Lessee of the 99 year lease) for its benefit a perpetual nonexclusive right and easement to use the Parking Facilities "now or hereafter located" on the Development Parcel and for pedestrian and motor vehicle ingress and egress to and from the MOB Parcel. The Declaration further provided that the parking areas, drives and other access and parking facilities can be used by others as determined by the Development Parcel Owner as long as the MOB Parcel Owner's right to the same was not impaired. In addition the Development Parcel Owner may alter the access and parking facilities, so long as the sum of the number of parking spaces available for use by the MOB Parcel Owner, after such alteration, is equal to not less than the number of parking spaces necessary to comply with all applicable governmental requirements regarding the total number of parking spaces required for the medical office building located on the MOB Parcel, such spaces to be located on the MOB Parcel, the Development Parcel or other land which is contiguous to

-16-

the Development Parcel. The Development Parcel Owner further assumed all responsibility to keep and maintain all access and parking facilities in good condition and repair and retained the right to assess reasonable parking fees for the right to park in the parking facilities.   Other easements granted by the Declaration to the MOB Parcel Owner included   an electrical easement, telecommunications easement, sewer easement and water easement.

        c) <u>Declaration of Connector Easements</u>

        Declarant:    Miami Beach Healthcare Group, Ltd. (HCA)

        Book/Page:    23272/0324

        The Declaration of Connector Easements confirmed that HCA intended to cause a parking garage of approximately 350,000 square feet consisting of approximately 1,050 parking spaces to be developed and constructed on the "Garage Parcel," a part of the Development Parcel adjacent to the MOB Parcel, and further granted for the benefit of the MOB Parcel Owner a perpetual and non-exclusive right and easement for pedestrian ingress and egress to and from the garage on, over and across the "Connector Facilities." In addition to building the "Garage Parcel"   facilities, HCA also built an above ground walkway between the "Garage Parcel" and the MOB, which was included within the easement rights granted to the MOB Parcel Owner. The Connector Facilities were defined to mean "the enclosed pedestrian walkways . . . connecting the Garage and the MOB now <u>or hereafter located</u> on the connector easement parcel." HCA further declared that it had the "right and easement" as the Garage Parcel Owner to operate, maintain, repair and replace any "building components that are part of the connector facilities." "MOB Parcel Owner" was defined in the Declaration to include any person who leased the MOB Parcel for a term of 50 years or more.

        d) <u>Memorandum of [Office] Lease Agreement (Office Lease Memorandum)</u>

        Landlord:    RTH Partners, LLLP

        Tenant:    Miami Beach Healthcare Group, Ltd. (HCA)

        Book/Page:    23272/406

        (1) The recorded Office Lease Memorandum is a summary of some of the basic terms of an unrecorded office space lease between Miami Beach Healthcare Group, Ltd., as

-17-

tenant, and RTH Partners, LLLP, as landlord, of the Aventura Heart and Health Building which had not yet been constructed. The Medical Office Memorandum showed a lease term of ten (10) years beginning on the Commencement Date. The commencement date and the financial terms of the lease, including the amount of rent HCA, as Tenant, agreed to pay the RTH limited partnership were not disclosed in the Office Lease Memorandum, but were contained in a cross-referenced "Lease Agreement" which was not recorded. The identities of the limited partners of RTH Partners, LLLP, were also not disclosed in the Office Lease Memorandum. The Office Lease Memorandum states that the tenant (HCA) had the option to extend the Lease for two (2) additional periods of five (5) years. Greenfield signed the Office Lease Memorandum on behalf of RTH Equity, LLC, as the general partner of RTH Partners, LLLP, the Aventura Heart and Health Building (MOB) landlord.

(2) The tenant space in the Aventura Heart and Health Building leased by HCA included 10,100 rentable square feet of the 1st floor and 11,900 rentable square feet of the 4th floor or approximately 22% of the total rentable area in the building.

29.     With its 99 year ground lease and parking and connector easements in hand, on April 12, 2005, RTH Partners, LLLP, obtained a construction loan for $17,500,000 from Union Planters Bank to build the Aventura Heart and Health Building. The loan was memorialized in a Mortgage and Security Agreement (recorded on April 14, 2005) and secured by the 99 year ground lease, the soon to be constructed MOB and all easements, rents, and other rights, title and interest of RTH Partners, LLLP, as Mortgagor in connection with the Mortgaged property. Greenfield, on behalf of RTH Equity, LLC, as the general partner of RTH Partners, LLLC, signed for the Mortgagor. Simultaneously, Miami Beach Healthcare Group, Ltd., recorded a Consent of Fee Mortgage on Fee Simple Estate acknowledging the mortgagee, Union Planters Bank's, status and right to cure under the ground lease and that the mortgage should be treated as a "First Mortgage."

30.     On April 29, 2005, Greenfield, on behalf of RTH Equity, LLC, as the general partner of RTH Partners, LLLC, recorded a Notice of Commencement for the "Construction of a 100,000 square foot, five-story, medical office building on a 1.65 +/- acre site located in the

Aventura Hospital and Medical Center Campus, Miami-Dade County, Florida" indicating that the limited partnership was beginning construction on the Aventura Heart and Health Building. Construction was completed in approximately February 2006. On February 16, 2006, RTH Partners, LLLC, as the owner and landlord of the new MOB, began interior tenant build outs, as indicated by a series of recorded Notices of Commencement which were recorded on the following dates as follows:

a) February 16, 2006   – Interior tenant build-out for Aventura Endocrine Associates, PA, of approximately 3,000 square feet. The physicians at Aventura Endocrine Associates are members of the active medical staff of Aventura Hospital and are patient referral sources for the Aventura Hospital.

b) February 16, 2006 – Interior tenant build-out for South Broward Cardiology of approximately 4769 square feet. South Broward Cardiology, which subsequently became part of Cardiovascular Consultants of South Florida (CCSF), is a fictitious name used by Integrated Care, LLC. Physicians that have been associated with South Broward Cardiology, Integrated Care, LLC and CCSF are members of the active medical staff of Aventura Hospital and are patient referral sources for the Aventura Hospital.

c) March 13, 2006 – Interior tenant build-out for Miami Beach Healthcare Group (HCA) of approximately 1310 square feet. Miami Beach Healthcare is the same entity (HCA) as Aventura Hospital (HCA), the recipient of physician referrals.

d) March 13, 2006 – Interior tenant build-out for Dr. Carlos Coelho of approximately 1400 square feet. Dr. Coelho, an endocrinologist, is a member of the active medical staff of Aventura Hospital and a patient referral source for Aventura Hospital.

e) June 30, 2006 – Interior tenant build-out for Aventura Cardiovascular Surgeons of approximately 1700 square feet. Physicians associated with Aventura Cardiovascular Surgeons are believed to be members of the active medical staff of Aventura Hospital and are patient referral sources for the Aventura Hospital.

f) June 30, 2006 – Interior Tenant build-out for Aventura Neurosurgery of approximately 2625 square feet. Physicians associated with Aventura Neurosurgery are believed

-19-

to be members of the active medical staff of Aventura Hospital and are patient referral sources for the Aventura Hospital.

g) July 17, 2006 – Interior Tenant build-out for Miami International Cardiology Consultants (MICC) of approximately 5768 square feet. MICC cardiologists are members of the active medical staff of Aventura Hospital and are patient referral sources for the Aventura Hospital. MICC is a cardiology practice that has provided cardiology services in South Florida since 1997. MICC currently consists of 12 cardiologists and over 80 employees. Since its inception and through most of 2012, MICC has operated as a physician-owned cardiology practice. In the latter half of 2012, MICC was acquired by Miami-Dade Cardiology Consultants, LLC, an HCA-affiliated entity, and has continued to operate under the same fictitious business name. Dr. Kevin Coy, a MICC founder, and other cardiologists have maintained their physician practices with MICC. Some or all of the physicians may also have ownership positions in Miami-Dade Cardiology Consultants, LLC.

h) April 4, 2007 –  Interior Tenant build-out for Cardiovascular Consultants of South Florida (CCSF) of approximately 1318 square feet. Cardiovascular Consultants of South Florida   is a cardiology practice consisting of 21 cardiologists. Cardiovascular Consultants of South Florida is a fictitious name, filed in February, 2011, by its owner, Integrated Care, LLC (also know as Aventura Cardiology Partners, LLC), which was formed in 2004. Ten CCSF cardiologists practice at the Aventura Heart and Health Building location.   CCSF physicians are members of the active medical staff of Aventura Hospital and are patient referral sources for the Aventura Hospital.

31.     On October 4, 2007, RTH Partners, LLLP, sold all of its interest in the Aventura Heart and Health Building and its leasehold interest in the 99 year MOB Parcel ground lease to VG Aventura MOB, LLC (Ventas). The sale price for the MOB, including the MOB Parcel ground lease, was approximately $25.4 million. The property conveyed in the sale was subject to the provisions of the Declaration of Covenants, Restrictions and Easements and Non-Exclusive Cross Parking Agreement documents. A Special Warranty Deed and a Memorandum of Assignment and Assumption of Ground Lease were recorded on or about October 9, 2007. The documents conveyed all rights, title and interests of RTH Partners, LLLP,

in the MOB and the MOB Parcel ground lease, including all parking, utility and connector easements, to Ventas.   The recorded documents were signed by Greenfield on behalf of RTH Equity, LLC, as the General Partner of RTH Partners, LLLP. The identities of the limited partners of RTH Partners, LLLP, were not disclosed in any of the recorded conveyance documents.

    32.  Based upon information and belief, plaintiffs herein allege:

      -- that the undisclosed limited partners of RTH Partners, LLLP, included patient referring physicians and/or their patient referring group practices, including but not limited to Aventura Endocrine Associates, the Integrated Care entities, South Broward Cardiology and CCSF, and MICC,

      --that the patient referring physicians and/or group practices who were limited partners of RTH Partners, LLLP, have referred and continue to refer patients to the Aventura Hospital,

      -- that the referring physician and/or group practice limited partners received sizeable portions of the inflated profit generated from the sale to Ventas of the ownership, leasehold and easement interests that RTH Partners, LLLP, held in the Aventura   Heart and Health Building and the 99 year MOB Parcel ground lease, and

      -- that the profit from the sale of the Aventura Heart and Health Building and the 99 year MOB Parcel ground lease to Ventas was inflated based on the undervaluation of the lease payment significantly below fair market value that HCA charged RTH Partners, LLLC, for the 99 year ground lease and its incorporated easements. The profit from the sale of the MOB and ground lease was a product of the difference between the approximately $25.4 million paid by Ventas to purchase the MOB and ground lease from RTH Partners, LLLP, and the amount paid by RTH Partners, LLLP, for both the 99 year ground lease and to construct the MOB.

    33.  To ensure that "parking spaces in excess of the number required by City Code [would] be available for the new medical office building," the site value for the land necessary to build the Aventura Heart and Health Building and the requisite parking structure would have been approximately $4,170,000.   The indicated cost to build the portion of the garage needed for the medical office building to comply with the City of Aventura's parking standards would have

-21-

been approximately $5,250,000. Thus, the indicated single lump-sum 99 year ground lease payment (or its present value equivalent amortized over time) for the MOB ground lease and parking easement rights/benefits should have been approximately $9,420,000. However, the lease terms that HCA gave to RTH Partners, LLLP, were not reached in a manner consistent with arm's length negotiation and did not reflect fair market value.   Based upon information and belief,   plaintiffs herein allege that the total amount of the concealed ground lease payment agreed to be paid by RTH Partners, LLLP, to Miami Beach Healthcare, Inc., was substantially and materially less than the fair market value of $9.42 million. The amount that RTH Partners, LLLP, agreed to pay HCA for the MOB Parcel ground lease that is believed to have been well below Fair Market Value inflated the amount of profit realized by RTH Partners, LLLP, from the subsequent sale of the MOB and ground lease to Ventas.

34.     The profit realized by RTH Partners, LLLP, both in the operation of the Aventura   Heart and Health Building and its subsequent sale to Ventas was further enhanced by Miami Beach Healthcare (HCA's) generous long term lease of 22,000 rentable square feet on the first and fourth floor of the MOB. When RTH Partners, LLLP, conveyed its ownership and leasehold interests in the Aventura Heart and Health Building and MOB Parcel to Ventas on October 4, 2007, two and a half years after Miami Beach Healthcare Group, as the tenant, executed the office lease agreement for the MOB space, the bulk of HCA's ten year office space lease term still remained.

35.     The tenant space that was leased to Miami Beach Healthcare Group (HCA) was leased in a shell (unfinished) condition with the landlord providing the tenant a tenant improvement allowance (believed to be $50 per usable square foot) to finish the space as needed/ when needed. The tenant improvement allowance was approximately 25% to 30% of the total cost per square foot to RTH Partners, LLLP, for the medical office building improvements. As such, the contract rent per square foot should have been be reduced by 25% to 30% for the tenant shell space as compared to finished tenant space. However, it is believed that the contract rent for the tenant shell space was adjusted for the shell condition for only a short term, believed to be 12 months. After that the contract rental rate was commensurate for finished tenant space.

36.     Miami Beach Healthcare Group has attempted to sublease a portion

of its tenant shell space in the Aventura Heart and Health Building. This portion of its tenant shell space – 6,500 square feet on the first floor and 7,500 square feet on the 4th floor or 64% of the total tenant space leased by Miami Beach Healthcare Group – was recently listed as available for lease for $24.00/SF net with an aggressive tenant improvement allowance provided to a prospective subtenant. The fact that 64% of the total lease space is still unfinished shell space and available for lease indicates that the fair market rental rate for the space "built-out" for a typical medical office tenant at this location is less than $24.00/SF net. It is believed that Miami Beach Healthcare Group has been paying the MOB landlord a similar rental rate for this space in a shell condition. As such, Miami Beach Healthcare Group has paid and is paying the landlord (RTH Partners, LLLP, before October 4, 2007) a rental rate well above the fair market rental rate for the tenant shell space. Additionally, because 14,000 square feet or 64% of the total tenant space (22,000 square feet) is still unoccupied shell space and is available for sublease,   Miami Beach Healthcare Group (HCA) has leased the space from RTH Partners, LLLP, without a legitimate business purpose.

37.    The rights granted by HCA for the benefit of the MOB Parcel Owner in the Declaration the Declaration of Covenants, Restrictions and Easements, which were recorded on April 14, 2005, allowed the MOB's tenants, subtenants, invitees and others to use the parking facilities with the permission of the MOB owner. As a result, all of the patient referring physician tenants of the Aventura Heart and Health Building and their employees, patients and invitees have been permitted to use the adjacent Phase I six-story stand-alone parking structure, built in conjunction with the Phase II MOB, for all parking needs. Additionally, the July 2002 Non-Exclusive Cross-Parking Agreement recorded on October 15, 2005, further expanded the parking rights by granting the MOB's tenants and their employees, agents, guests, customers and invitees the right to use essentially all parking spaces on the AHMC campus. **The Non-exclusive Cross Parking Easement is a covenant running with the land.** As a result, the referring physician MOB tenants have been receiving "free" parking privileges on the entire AHMC campus. Although the Miami Beach Healthcare Group/HCA recently began to exercise its retained right to assess "reasonable" parking fees in the adjacent Phase I six-story stand-alone garage under the April 14, 2005, Declaration of Covenants,

Restrictions and Easements, these fees are not charged to the referring physician MOB tenants and their staff who are provided "badges" by the Aventura Hospital Human Resources Department allowing them free parking.

38.     The free parking provided by HCA to the MOB's referring physicians is a form of non-monetary remuneration that exceeds the amount permitted under the Stark statute's non-monetary compensation and medical staff incidental benefits exceptions. The exceptions permit hospitals, under limited circumstances, to provide non-cash equivalent benefits – including parking – to medical staff members up to a specified dollar limit, set annually, as follows:

| Year | Incidental Benefit | Non-Monetary Compensation Annual Limit |
| --- | --- | --- |
| 2005 | Less than $26/day | $308 |
| 2006 | Less than $27/day | $322 |
| 2007 | Less than $28/day | $329 |
| 2008 | Less than $29/day | $338 |
| 2009 | Less than $30/day | $355 |
| 2010 | Less than $30/day | $355 |
| 2011 | Less than $30/day | $359 |
| 2012 | Less than $31/day | $373 |
| 2013 | Less than $32/day | $380 |

39.     The free parking provided by HCA to the physician tenants of the Aventura Heart and Health Building and their staff, patients and invitees does not qualify under either the medical staff incidental benefits exception or the non-monetary compensation exception to the Stark statute. The medical staff incidental benefits exception only applies when medical staff physicians are making hospital rounds or are engaged in other services or activities directly benefitting the hospital or hospital patients. Additionally, the value of the free parking provided by HCA to the patient referring MOB tenant physicians far exceeds the annual limit of the non-monetary compensation exception.

40.     The indicated value of the parking benefit for the portion of the Phase I six story

-24-

stand-alone garage needed to ensure that "parking spaces in excess of the number required by City Code will be available for the new medical office building" is in the approximate range of $9,600 to $13,000 per referring physician per year, excluding the value of the land underlying the parking garage. Even with the implementation of hourly and daily parking fees for visitors to the Aventura campus, the parking benefit (a form of non-monetary compensation) that HCA is providing the patient-referring physician tenants of the Aventura Heart and Health Building is far in excess of the limits imposed by the Stark statute, and which otherwise constitutes a kickback under the AKS.

41.    As shown above, beginning in approximately April 2005, HCA has provided, and caused others to provide, unlawful remuneration to physicians in order to obtain patient referrals and disguised this unlawful remuneration in the form of a grossly undervalued 99 year real property easement, free and/or undervalued expensive parking facilities and excessively generous leasing arrangements that were neither consistent with fair market value in an arms length transaction nor commercially reasonable even if no referrals had been made between the physicians and HCA. As a result, HCA has submitted, and caused others to submit, to the federally sponsored health care programs, including Medicare, TriCare and Medicaid, false or fraudulent claims for reimbursement and records in support of such false claims for the services HCA provided to the beneficiaries of such federally sponsored health care programs that had been referred to HCA unlawfully.

42.    The defendant, HCA, through the Aventura Hospital, HCA's wholly owned entity,   has presented or caused to be presented these claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent. Under the False Claims Act, such claims were false and/or fraudulent because defendant HCA was not entitled to be paid for them. The defendant was not entitled to be paid for these claims because it forfeited the right to bill and was not entitled to bill any federally sponsored health care program for items and services that it provided to the patients referred to it in violation of the AKS and the Stark statute.

43.    In addition to the knowing submission of false claims in violation of the False

Claims Act, the defendant has also knowingly made, used, or caused to be made or used, false records or statements (i.e. the false certifications and representations on claim forms or their electronic equivalents and cost reports falsely attesting to compliance with the Stark statute and the AKS) which are material to the false or fraudulent claims paid or approved in violation of the False Claims Act.

44.     By virtue of the false or fraudulent claims knowingly made, used, or caused to be made or used by the defendant and the false records or false statements knowingly made or caused to be made by the defendant which are material to the false claims that were paid or approved, the United States has suffered damages and therefore is entitled to statutory damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## VII.
## SECOND CLAIM FOR VIOLATION OF THE
## FLORIDA FALSE CLAIMS ACT

45.     Plaintiffs repeat and reallege paragraphs 1 through 44 as if fully set forth herein.

46.     Since approximately April 2005, physicians tenants of the MOB and/or Physicians who have had an ownership interest as a limited partner in RTH Partners, LLLP, to whom the defendant HCA, through Miami Beach Healthcare, Ltd, has provided illegal remuneration and with whom HCA entered into illegal financial relationships have referred large volumes of patients with health care coverage from Florida Medicaid to the Aventura Hospital which, in turn, has submitted and caused to be submitted claims for payment to Florida Medicaid in the hundreds of thousands, if not millions of dollars, for services provided to these referred patients.

47.     The defendant, HCA, through the Aventura Hospital, has presented or caused to be presented these claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent. Under the Florida False Claims Act, Stat. Ann. §68.081 *et seq.*, such claims were false and/or fraudulent because defendant HCA was not entitled to be paid for them. The defendant was not entitled to be paid for these claims

-26-

because HCA forfeited the right to bill and was not entitled to bill any federally sponsored health care program, including Florida Medicaid whose funding is partly derived from the federal government, because it had provided and was providing unlawful remuneration to the MOB tenant physicians and/or physicians who have had an ownership interest as a limited partner in RTH Partners, LLLP, intending that remuneration to induce patient referrals in violation of the AKS.

48.     In addition to the knowing submission of false claims in violation of the Florida False Claims Act, the defendant has also knowingly made, used, or caused to be made or used, false records or statements (i.e. the false certifications and representations on claim forms or their electronic equivalents and cost reports falsely attesting to compliance with the AKS ) to get false or fraudulent claims paid or approved in violation of the FFCA.

49.     By virtue of the false or fraudulent claims knowingly made, used, or caused to be made or used by the defendant and the false records or false statements knowingly made or caused to be made by the defendant to get false claims paid or approved, the State of Florida has suffered damages and therefore is entitled to statutory damages under the Florida False Claims Act, to be determined at trial, plus a civil penalty for each violation.


PRAYER

WHEREFORE, *Qui Tam* Plaintiff, Thomas Bingham, for the United States, for the State of Florida and for himself, prays as follows:

A.     Against the defendant, treble damages and civil penalties up to the maximum permitted by law, for the maximum *qui tam* percentage share allowed by law and for attorney's fees, costs and reasonable expenses; and

B.     For any and all other relief to which the plaintiffs may be entitled.

-27-

JURY DEMAND

Plaintiffs request trial by jury.

Dated:                          /s/ Jonathan Kroner

                                Jonathan Kroner, FBN 328677
                                420 Lincoln Road, Suite 248
                                Miami Beach, Florida 33139-3031

                                (305) 310-6046
                                jk@FloridaFalseClaim.com


                                Phillip E. Benson, MN #0394772
                                *(Pro Hac Vice Application Pending)*
                                WARREN ■ BENSON Law Group
                                333 Washington Ave North, Ste 300
                                Minneapolis, MN 55401
                                Tel: 952-955-3688
                                Philbenson@warrenbensonlaw.com


                                Attorneys for *Qui Tam* Plaintiff
                                Thomas Bingham

-28-