UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 13-23671-Civ-COOKE/TORRES

UNITED STATES OF AMERICA and
THE STATE OF FLORIDA *ex rel.*
THOMAS BINGHAM,

    Plaintiffs,

vs.

HCA, INC.,

    Defendant.
_____/

## ORDER ON DEFENDANT'S MOTION TO DISMISS

Relator Thomas Bingham ("Plaintiff" or "Relator") brings this action on his own behalf, and on behalf of the United States and the State of Florida, pursuant to 31 U.S.C. § 3730 of the False Claims Act ("FCA") and the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*, as a result of Defendant HCA, Inc.'s ("Defendant" or "HCA") alleged payment of unlawful remuneration to referring physicians in violation of both the Stark Statute and the Anti-Kickback Statute.  Relator filed his Complaint under seal on October 10, 2013 (ECF No. 1).  The United States Government and the State of Florida both declined to intervene in this action on January 1, 2015 and March 4, 2015 respectively (ECF Nos. 21, 24).  Relator filed his First Amended Complaint on August 15, 2014 (ECF No. 14).  In response, Defendant filed a Motion to Dismiss (ECF No. 38), to which Relator filed his Opposition to Motion to Dismiss (ECF No. 44), and Defendant filed its Reply to Relator's Opposition to HCA's Motion to Dismiss (ECF No. 46).  After reviewing the Motion, the Response and Reply thereto, the record, and the relevant legal authorities, Defendant's Motion to Dismiss is granted in part and denied in part.

### I. BACKGROUND

Defendant HCA, a national health care services provider, is a Delaware Corporation with its principal executive offices in Nashville, Tennessee.  Am. Compl. ¶ 15, ECF No. 14. HCA owns and operates the following entities: Aventura Hospital and Medical Center

("AHMC"), which includes the Aventura Hospital; Miami Beach Healthcare Group, Ltd., through its wholly owned entity the Columbia Hospital Corporation; and Centerpoint Medical Center of Independence, LLC, formerly known as Midwest Division-IRCH, LLC. *Id.* at ¶¶ 17-20. Relator, a "Certified General Real Estate Appraiser" in the state of Tennessee, claims to be an "insider" with respect to his knowledge of the schemes alleged herein since HCA has previously been a client of his employer, "one of the largest medical office management firms in the country." *Id.* at ¶¶ 11, 14. He allegedly employed his "special skills as a commercial real estate appraiser to reveal the fraud scheme alleged in [the] [C]omplaint." *Id.* at ¶ 12.

Relator alleges that HCA, in violation of the Stark Statute and the Anti-Kickback Statute, "purposefully obscured the remuneration it paid to physicians to induce them to refer patients," and subsequently submitted claims from those referrals to the government, thereby defrauding the government. *Id.* at ¶¶ 2, 167. In order to better understand the schemes alleged, it is important to first understand the applicable statutory provisions. I will explore the applicable provisions of the Stark Statute, Anti-Kickback Statute, and FCA before exploring the factual allegations concerning each scheme.

A. Applicable Statutory Provisions

1. Stark Statute

The Stark Statute, 42 U.S.C. § 1395nn, "prohibits doctors from referring Medicare patients to a hospital if those doctors have certain specified types of 'financial relationships' with that hospital" and also "prohibits that same hospital from presenting claims for payment to Medicare for any medical services it rendered to such patients." *United States ex rel. Mastej v. Health Mgmt. Assocs.*, 591 F. App'x 693, 698 (11th Cir. 2014). A "financial relationship," as defined by Section 1395nn(a)(2)(B), is a "compensation arrangement" between a physician and a hospital. Under the regulations implementing the Stark Statute, a "compensation arrangement" is "any arrangement involving any remuneration," and "remuneration" is "any payment or benefit, made directly or indirectly, overtly or covertly, in cash or in kind." 42 C.F.R. §§ 411.351, 411.354(c).

The Stark Statute prohibits forms of direct and indirect compensation arrangements. A direct compensation arrangement "exists if remuneration passes between the referring physician ... and the [hospital] without any intervening persons or entities." 42 C.F.R. §

411.354(c)(1). An indirect compensation arrangement exists if (1) remuneration passes through an "unbroken chain" between the referring physician and the hospital; (2) the "referring physician ... receives aggregate compensation ... that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the [hospital]"; and (3) the hospital "has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician ... receives [the described] aggregate compensation." 42 C.F.R. § 411.354(c)(2).

However, not every compensation arrangement constitutes a prohibited financial relationship under the Stark Statute. For example, "indirect compensation arrangements do not constitute a financial relationship if the compensation is (1) equal to the fair market value for services and items actually provided; (2) not determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician for the hospital; and (3) commercially reasonable." *United States v. All Children's Health Sys.*, 2013 WL 6054803, at *4 (M.D. Fla. Nov.15, 2013) (quoting 42 C.F.R. § 411.357(p)). *See also* 42 C.F.R. § 411.357(a) (describing a lease permitted under the Stark Statute).

   2. Anti-Kickback Statute

Under the Anti-kickback Statute, 42 U.S.C. § 1320a–7b(b), a hospital commits a felony by financially inducing a physician to refer a Medicare patient. Specifically, 42 U.S.C. § 1320a–7b(b)(2) prohibits "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person ... to refer an individual to a person [for medical services] for which payment may be made in whole or in part under a Federal health care program." The exceptions to the Anti-kickback Statute closely parallel the exceptions to the Stark Statute. *See* 42 C.F.R. § 1001.952(b) (describing a lease permitted under the Stark Statute).

   3. FCA

"The False Claims Act is the primary law on which the federal government relies to recover losses caused by fraud." *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005). Under 31 U.S.C. § 3729(a)(1) and (a) (2), the False Claims Act imposes liability on any person who "knowingly presents, or causes to be

3

presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Because compliance with both the Stark Statute and the Anti-Kickback Statute are a prerequisite for Medicare payments, a violation of either of those statutes can form the basis of liability under the False Claims Act.

   B. *Factual Allegations*

      1. Centerpoint Scheme

This scheme involves complex real estate transactions that center on the construction of a medical office building and parking lot on the Centerpoint Medical Center campus ("Centerpoint"), as well as lease agreements between wholly owned HCA entity, Midwest Division-IRCH, LLC ("HCA Entity"), Tegra Healthcare Properties ("Tegra"), a medical office building development and property management company, and the referring physicians occupying the medical office building. Am. Compl. ¶¶ 44–45, 99.

More specifically, on June 27, 2005, HCA Entity leased undeveloped land at Centerpoint to Tegra for a single lump sum payment of $1,780,000. *Id.* at ¶ 45–46. The ninety-nine year ground lease entered into between HCA Entity and Tegra envisioned that Tegra would build a medical office building with over 200,000 rentable square feet on roughly 1.5 acres of land. *Id.* at ¶¶ 46, 48. In addition, the ground lease included a 9.5 acre parking easement, which granted Tegra a perpetual non-exclusive right and easement to HCA Entity's adjacent parking facilities. *Id.* at ¶ 49.

On the same day the parties entered into the ground lease, HCA Entity and Tegra also executed a confidential Development Agreement. *Id.* at ¶ 50; *see also* Ex. H, ECF No. 14-8. Pursuant to the Development Agreement, HCA Entity agreed to, at its own expense, construct and maintain a sufficient number of parking spaces, in line with local zoning and regulatory requirements, to meet the parking needs of Tegra and its prospective physician tenants. Am. Compl. ¶ 51. From 2005 through 2007, Tegra developed and built the Centerpoint Medical Office Building at a cost of approximately $30,000,000. *Id.* at ¶ 52. In 2012, Tegra sold the building, ground lease, and associated easements for approximately $50,000,000. *Id.* at ¶ 53.

Relator alleges that, in accordance with the various agreements entered into between HCA Entity and Tegra in 2005, HCA Entity actually subsidized Tegra's development and

4

operation of the Centerpoint Medical Office Building in return for Tegra's agreement to share a portion of the building's cash flow, including proceeds from the sale of the Medical Office Building, with its physician tenants. *Id.* at ¶ 54. In support of this allegation, Plaintiff references Cash Flow Participation Agreements that Tegra entered into with several of its physician tenants, who also happened to refer patients to Centerpoint. *Id.* at ¶ 55. Under the terms of these agreements, Tegra compensated each physician tenant with a pro-rata portion of the property's operating cash flow, which included proceeds from the 2012 sale of the building. *Id.* Plaintiff estimates that Tegra realized a net profit of $17 million from the sale of its Centerpoint Medical Office Building and that a portion of this profit was doled out to physician tenants in accordance with "participant's termination share" provisions in the Cash Flow Participation Agreements. *Id.* at ¶ 73. As such, since payments under these Cash Flow Participation Agreements increased with the size of the leased space, Plaintiff alleges that "the payments made to the referring physicians varied with, or took into account, the volume or value of referrals or other business that they generated;" larger offices could be expected to refer more patients, therefore receiving a greater participant's termination share. *Id.* at ¶¶ 57, 75. Plaintiff further alleges that HCA Entity intentionally postdated the Cash Flow Participation Agreements to avoid scrutiny. *Id.* at ¶ 66.

Plaintiff alleges that HCA Entity further subsidized Tegra by granting Tegra a long-term parking easement. *Id.* at ¶ 77. Rather than have Tegra spend money constructing its own parking structure or lease additional land for parking spaces, HCA Entity agreed to construct the parking spaces on its own property, and subsequently granted Tegra, as part of its ninety-nine year ground lease, a perpetual easement to use HCA Entity's parking facilities for the entire length of the lease term. *Id.* at ¶ 80. According to Plaintiff's calculations, Tegra saved approximately $5,700,000 as a result of this valuable parking easement, a profit that was eventually passed along to referring physician tenants. *Id.* at ¶ 84. Plaintiff further alleges that this benefit varied with or took into account the volume or value of referrals or other business generated by referring physicians. *Id.* at ¶ 83.

Finally, Plaintiff alleges that HCA Entity subsidized Tegra by renting space in the Centerpoint Medical Office Building that it never actually intended on occupying. *Id.* at ¶ 86. This "space lease" covered approximately 70,477 feet and HCA Entity agreed to pay Tegra $13.06 per foot plus $3.50 in costs for an initial annual commitment of

$1,167,099.00. *Id.* at ¶¶ 87, 88. Relator alleges that Defendant never intended to actually use the space; instead, it was a cash-flow subsidy for Tegra with the understanding that HCA Entity would be relieved of its burden to pay rent only when Tegra leased the space to referring physician tenants. *Id.* at ¶ 91. Relator further alleges that HCA was essentially paying a premium to hold the space for prospective medical tenants who would ultimately refer patients to HCA, which is further evidenced by HCA's agreement to make improvements to the space, at its own expense, that would eventually be leased to physician tenants. *Id.* at ¶ 93. Relator alleges that this was just another way for HCA to funnel money to its referring physician tenants. *Id.* at ¶ 98.

    2. <u>Aventura Scheme</u>

This scheme involves the Aventura Hospital and Medical Center ("AHMC"), an HCA owned and operated entity, which includes Aventura Hospital. *Id.* at ¶ 17. Aventura Hospital provides inpatient and outpatient services to patients covered by federal and state sponsored health care programs, including Medicare, Medicaid, and Tricair. *Id.* at ¶ 103. The Aventura Heart & Health Building ("AHHB") is a multi-tenant medical office building located on the AHMC campus. *Id.* at ¶ 106. Prior to the construction of AHHB, HCA was required to obtain site plan approval from the City of Aventura, which included the approval of plans to meet the parking requirements for medical offices. *Id.* at ¶¶ 107–108. HCA, through its wholly owned entity Miami Beach Healthcare Group, Ltd., executed a non-exclusive cross-parking agreement granting all present and future owners and tenants at AHHB, including their employees, agents, guests, and invitees, a non-exclusive right to use all parking spaces at AHMC, excluding Aventura Hospital's parking spaces. *Id.* at ¶ 108. The Greenfield Group, a real estate developer, served as HCA's consultant for the two-phase medical office building and parking garage development project. *Id.* at ¶ 109. The estimated cost of constructing the parking structure was approximately $15 to $20 million. *Id.* at ¶ 113.

On April 12, 2005, various documents related to the medical office building and parking garage project were simultaneously recorded in the public records of Miami-Dade County, Florida. *Id.* at ¶ 115. The recorded documents included the following: (1) Memorandum of Lease Agreement ("Memorandum") between Miami Beach Healthcare

6

Group, Ltd. and RTH Partners, LLLP ("RTH Partners")[1] that detailed the specifics of the 99 year ground lease; (2) Declaration of Covenants, Restrictions, and Easements ("Declaration"), listing Miami Beach Healthcare, Group, Ltd. as the Declarant and granting the medical office building parcel owner a perpetual nonexclusive right and easement to use the parking facilities on the AHMC campus; (3) Declaration of Connector Easements, listing Miami Beach Healthcare Group, Ltd. as the Declarant and granting the medical office building parcel owner a perpetual nonexclusive right and easement for pedestrian ingress and egress to and from the garage, which was located on the AHMC campus; (4) Memorandum of Lease Agreement, listing RTH Partners as the landlord and Miami Beach Healthcare Group, Ltd. as the tenant and summarizing some of the basic terms of an unrecorded office space lease in the AHHB between RTH Partners and Miami Beach Healthcare Group, Ltd.; and (5) Consent of Fee Mortgage on Fee Simple Estate, recorded by Miami Beach Healthcare Group, Ltd. *Id.* at ¶¶ 116-128.

Construction of the AHHB began in April 2005 and was completed in February 2006. *Id.* at ¶ 129. RTH Partners then began interior tenant build-outs for physician tenants who Relator alleges are patient referral sources for Aventura Hospital. *Id.* These interior build-outs were completed in April 2007. *Id.* In October 2007, RTH Partners sold all of its interest in AHHB and its leasehold interest in the ninety-nine year medical office ground lease to VG Aventura MOB, LLC ("Ventas") for approximately $25.4 million. *Id.* at ¶ 130. Relator alleges that the property was sold for a substantial gain because, "based upon information and belief," the site value for the land necessary to build the AHHB and the requisite parking structure would have been approximately $4,170,000 and the cost to build the portion of the garage needed for the AHHB to comply with parking standards would have been approximately $5,250,000, for a total amount of $9,420,000. *Id.* at ¶¶ 133, 133. However, because HCA and RTH Partners did not negotiate their lease terms at arm's length, Relator alleges that RTH Partners paid Miami Beach Healthcare Group, Inc. less than $2 million for the ground lease. *Id.* at ¶ 134. Additionally, RTH Partners' profit was further enhanced by Miami Beach Healthcare Group, Inc.'s long term lease of 22,000 square feet of office space in the AHHB for well above fair market rental rate. *Id.* at ¶¶ 137,

---

[1] In June 2004, William R. Greenfield, owner of the Greenfield Group, formed RTH Equity, LLC, a wholly owned Greenfield Group entity. In turn, RTH Equity, LLC formed RTH Partners, LLLP, with RTH Equity, LLC listed as its general partner.

139.

Relator alleges, "based upon information and belief," that physician tenants benefited from the arrangement between Miami Beach Healthcare Group, Inc. and RTH Partners in the following ways: (1) referring physicians had an equity interest in the AHHB and received portions of the gain generated from its sale to Ventas; and (2) referring physicians received free parking benefits for themselves and all patients, valued at between $9,600 and $13,000 per referring physician per year. *Id.* at ¶¶ 131, 142.

## II. LEGAL STANDARD

To state a claim under the False Claims Act, a relator must satisfy two pleading standards. First, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This Rule does not require detailed factual allegations, but it demands more than an unadorned, conclusory accusation of harm. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must "plead all facts establishing an entitlement to relief with more than 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although it is axiomatic that the Court must accept as true all of the allegations contained in a complaint, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "[L]egal conclusions can provide the framework of a complaint, [but] they must be supported by factual allegations." *Id.* at 679.

A False Claims Act complaint must also "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002). The particularity requirement of Rule 9(b) is satisfied if the complaint alleges "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (citing *Clausen*, 290 F.3d at 1310). Generally, in order to plead the submission of a false claim with particularity, "a relator must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result." *United States ex rel. Matheny v. Medco Health Sol., Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012). A

8

plaintiff is not permitted "merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311. Instead, "some *indicia of reliability* must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." *Id.* (emphasis added). The Eleventh Circuit has recognized that while these requirements of Rule 9(b) may, in practice, make it difficult for a *qui tam* plaintiff to bring an action, they are necessary to prevent "[s]peculative suits against innocent actors for fraud" and charges of guilt by association. *Id.* at 1308.

### III. DISCUSSION

In its Motion to Dismiss, Defendant HCA argues the following with regard to both the Centerpoint and Aventura schemes: (1) Relator fails to allege that any physician tenant's lease rate changed or varied with the amount of referrals made to an HCA hospital; (2) Relator fails to demonstrate that any physician tenant received any benefit outside of the fair market value range from HCA; (3) Relator fails to plead facts indicating that HCA provided remuneration to tenant physicians for the purpose of inducing patient referrals; (4) Relator has failed to plead that anyone at HCA knowingly and willfully violated the Anti-Kickback Statute; and (5) Relator has failed to identify specific samples of false claims submitted by HCA for remuneration.

I will address HCA's arguments as they apply individually to each scheme alleged in the First Amended Complaint.

#### A. Centerpoint

##### 1. Violations of the Stark Statute

To plead a violation of the Stark Statute, the relator must allege: (1) a "financial relationship" between HCA and the physician; (2) a referral from the physician to HCA for "designated health services"; and (3) a claim "present[ed] or caus[ed] to be presented by HCA to an entity for "designated health services furnished pursuant to a referral." 42 U.S.C. § 1395nn(a)(1). HCA challenges the first factor, namely whether Relator has alleged that any improper financial relationship actually exists between HCA and referring physicians.

In the Centerpoint scheme, Relator appears to allege an indirect compensation

arrangement between HCA and referring physicians. As detailed more fully in the factual recitation above, Relator alleges that HCA provided referring physicians with a portion of the medical office building's operating cash flow, as well as profits after its sale, free parking, and other cash flow subsidies designed to funnel money to referring physicians. Relator plausibly alleges that the Cash Flow Participation Agreements entered into between physician tenants and Tegra take into account the volume or value of patient referrals to HCA. It is plausible, after accepting as true all facts alleged by Relator, that HCA (through Tegra) took into account patient referrals when assigning office space to physician tenants, thus compensating those who referred more patients to HCA at a higher rate. HCA's argument that Relator failed to plead facts suggesting that any physician's lease rate changed or varied with the amount of referrals it made to an HCA hospital is flawed in that it misapprehends the issue. As Relator points out, it is impossible to conceive of any defendant foolish enough to expressly state in a lease agreement that the rental amount shall change or vary with the amount of referrals made to an HCA hospital. Instead, Relator outlines a much more nuanced scheme wherein physician tenants draw a profit that varies with the size of their leased office space, which in turn, could plausibly vary based on the volume or value of patient referrals.

This reasoning holds true for parking benefits as well. Those physicians with larger practices and more patients can be expected to use more parking and other easement facilities versus smaller practices with fewer patients. *See U.S. v. Baycare Health Sys.*, 2015 WL 4878456, at *5 (M.D. Fla. Aug. 14, 2015) (holding that a nearly identical scheme adequately plead a violation of the Stark Statute).

Therefore I find that Relator has plausibly alleged a violation of the Stark Statute with regard to the Centerpoint scheme.

2. Violations of the Anti-Kickback Statute

To plead a violation of the Anti-Kickback Statute, the Relator must allege that (1) HCA knowingly and willfully (2) offered or paid any remuneration (3) to induce a physician to refer a patient for services that may be paid by a federal health care program. *See* 42 U.S.C. § 1320a-7b(b)(2).

The crux of HCA's argument regarding remuneration is that Relator fails to allege that any physician received any benefit outside of the fair market value range from HCA.

However, I disagree with HCA's argument on this point. As discussed, Relator alleges that HCA paid remuneration, including a portion of the medical office building's operating cash flow, as well as a portion of the profits from its sale, free parking, and other cash flow subsidies, to tenant physicians at the medical office building located on the Centerpoint campus. Additionally, Relator alleges a number of other benefits that referring physicians received directly, such as a $55 per foot tenant improvement allowance, and indirectly, such as when HCA leased back space from Tegra and imposed upon itself a construction obligation wherein HCA contracted to complete electrical, painting, flooring, heating, and air conditioning work to prepare the office space for future occupation by referring physician tenants. These allegations, when considered as a whole, present a scheme wherein Tegra passed on a variety of financial benefits it received from HCA to physician tenants, who in turn, leased office space at an effective rate per square foot that fell well below fair market value. *See U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*, 2013 WL 1289260, at *7-8 (S.D. Fla. Mar. 27, 2013) (*Tenet II*) (finding that a similar scheme sufficiently alleged a violation of the Anti-Kickback Statute).

With regard to HCA's argument that Relator has failed to allege that HCA actually intended to induce patient referrals by offering remuneration to physicians, I find the reasoning in *Tenet II* to be particularly enlightening. There, the Court held that the Relator "satisfied his pleading burden merely by alleging that [Defendant] was motivated to enter into below-market-rate leases at least *in part* to induce the physicians to refer patients to [Defendant]." *Tenet II*, 2013 WL 1289260, at *9. Here, Relator alleges "HCA purposefully obscured the remuneration it paid physicians to induce them to refer patients to HCA's hospitals." First Am. Compl. ¶ 2. Thus, as the Court did in *Tenet II*, I can "reasonably infer that a landlord would not enter into a lease agreement for a price that fell below the fair market value rate if some other consideration were not involved. Here, that other consideration would be, as Relator alleges, patient referrals." *Tenet II*, 2013 WL 1289260, at 9.

The numeric valuations alleged by Relator in the complaint support this line of reasoning. HCA charged Tegra a single upfront payment of $1.78 million for a 99-year ground lease on about 1.5 acres of land, which Relator believes to be well below fair market value. First Am. Compl. ¶¶ 46, 47. While I am not obligated to accept as true conclusory

11

allegations, Relator does provide further factual support of his contention that HCA intended to induce patient referrals. In addition to the 99-year ground lease, HCA also agreed to construct parking spaces on its own property and grant Tegra a perpetual easement. *Id.* at ¶ 80. Relator estimates the cost of constructing parking spaces at approximately $2,335,500. *Id.* at ¶ 79. Essentially, in Relator's view, "HCA gave up 9 ½ acres to lease 1 ½ acres for the construction of a medical office building for referring physicians," which "only makes sense if a primary purpose of the arrangement was to subsidize Tegra with a valuable asset that could then be paid to referring physician tenants…" *Id.* at ¶ 81.

Finally, HCA argues that Relator has failed to allege that anyone at HCA acted willfully and knowingly in offering remuneration to induce referrals. However, Relator alleges that HCA paid remuneration "knowingly and willfully" because HCA certified compliance with the Anti-Kickbak Statute by submitting "false certifications and representations on claim forms or their electronic equivalents and cost reports …" First Am. Compl. ¶ 198. This allegation has been deemed to be sufficient to satisfy the first prong of the Anti-Kickback Statute. *See Baycare*, 2015 WL 4878456, at * 6; *see also U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*, 2012 WL 2871264, at * 6 (S.D. Fla. July 12, 2012) (*Tenet I*) (finding sufficient to allege a claim under the Anti-Kickback Statute Relator's allegation that Defendant falsely certified compliance with the Anti-Kickback Statute).

Therefore, I find that Relator has sufficiently stated a claim for violations of the Anti-Kickback Statute by HCA with regard to the Centerpoint scheme.

3. <u>Violations of the FCA</u>

HCA argues that Relator's complaint fails to satisfy Rule 9(b) because he has failed to plead any specific samples of false claims submitted by HCA. "[T]here is no *per se* rule that a [False Claims Act] complaint must provide exact billing data or attach a representative sample claim." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358 (11th Cir. 2006). Rather, the complaint must provide some "indicia of reliability … to support the allegation of an *actual false claim* for payment being made to the Government." *Clausen*, 290 F.3d at 1311. Whether a complaint contains sufficient "indicia of reliability" to satisfy Rule 9(b) requires a "case-by-case" determination. *Atkins*, 470 F.3d at 1358. "At a minimum, a plaintiff-relator must explain the basis for [the] assertion that fraudulent claims

were actually submitted." *Mastej*, 591 F. App'x at 704.

After alleging violations of the Stark Statute and the Anti-Kickback Statute, Relator relies on information from the Centers for Medicare & Medicaid Services to allege that HCA submitted claims for unlawfully referred Medicare patients. More specifically, Relator includes information regarding (1) HCA's total revenue from Medicare and Medicaid; (2) HCA's revenue from inpatient Medicare claims; and (3) the names of referring physicians at the Centerpoint Medical Office Building along with each physician's aggregate number of Medicare patient referrals to Centerpoint hospital. *See Baycare*, 2015 WL 4878456, at *4-5 (finding sufficient "indicia of reliability" when relator relied on similar public filings); *see also Tenet I*, 2012 WL 2871264, at *6 (same).

"[T]he fraud alleged in this action does not depend as much on the particularized billing content of any given claim." *Baycare*, 2015 WL 4878456, at *4. Instead, "improper relationships with referring physicians taint every claim submitted as a result of those referrals." *Id.* While Relator has not provided specific samples of false claims submitted by HCA, the facts alleged provide sufficient "indicia of reliability" that HCA submitted false claims to the government for payment. Relator has thus stated a claim under the FCA with regard to the Centerpoint scheme.

B. Aventura

After reviewing Relator's complaint, it is patently clear that the Centerpoint scheme is far more specifically alleged than the Aventura scheme.[2] While Relator attempts to shock and awe the Court with reference to documents, numbers, memoranda, and declarations to give the appearance of a factually dense scheme, this scheme does not in fact provide sufficient "indicia of reliability" to find that HCA has violated the FCA.

Unlike the Centerpoint scheme, wherein Relator provides specific data regarding clear compensation arrangements between physician tenants and HCA through cash flow participation agreements, Relator's Aventura scheme alleges no such arrangements. Relator provides details regarding a parking easement, lists various memoranda and declarations filed with Miami-Dade County, and includes names of physician tenants, but fails to fully

---

[2] Relator appears to tacitly acknowledge the difference in specificity between the Centerpoint and Aventura schemes when he attempts to cite to information not included in his complaint to bolster his argument regarding the sufficiency of his Aventura allegations in his Response to Defendant's Motion to Dismiss. *See* Pl.'s Resp. 3, 6.

13

explain how these facts interconnect to form a scheme to defraud the United States. While a cursory glance at the facts alleged may seem to indicate the particularity necessary to overcome the requirements of Rule 9(b), a deeper look reveals otherwise.

A thorough examination of the Aventura scheme, similar to the examination conducted above for Centerpoint, would not be fruitful at this juncture because Relator has provided so few factual allegations in his complaint. Many of Relator's allegations are presented "upon information and belief" and are clearly conclusory. After presenting a collection of facts and innuendo, Relator then summarily concludes that HCA violated the FCA. *See, e.g.,* First Am. Compl. ¶ 131. However, this sparse pleading does not comport with the requirements of Rule 9(b). For example, while Relator includes information regarding specific physician tenants, including their cash flow participation agreements and Medicare referral numbers, when discussing the Centerpoint scheme, he provides no such specific information with regard to physicians involved in the Aventura scheme. It is impossible for this Court to conclude, without grossly speculating, that HCA did in fact submit false claims to the government for payment.

Therefore, I find that Relator has failed to state a claim under the FCA with regard to the Aventura scheme. As such, Defendant's Motion to Dismiss is granted with regard to the allegations relating to Aventura.

### IV. CONCLUSION

For the foregoing reasons, it is **ORDERED and ADJUDGED** that Defendant's Motion to Dismiss (ECF No. 38) is **GRANTED** *in part* **and DENIED** *in part* as follows:[3]

1. As to Relator's Centerpoint allegations, Defendant's Motion to Dismiss is **DENIED**.

2. As to Relator's Aventura allegations, Defendant's Motion to Dismiss is **GRANTED** with leave to amend. If Relator seeks to amend his First Amended Complaint, he must file a Second Amended Complaint within seven (7) days of the date of this Order.

**DONE and ORDERED** in chambers at Miami, Florida, this 28TH day of January 2016.

---

[3] I will defer ruling on Defendant's statute of limitations argument until the factual record is more fully developed.

_____
MARCIA G. COOKE
United States District Judge

Copies provided to:
*Edwin G. Torres, U.S. Magistrate Judge*
*Counsel of Record*

15