UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 13-23671-Civ-COOKE/TORRES

UNITED STATES OF AMERICA and
THE STATE OF FLORIDA *ex rel.*
THOMAS BINGHAM,

      Plaintiffs,

vs.

HCA, INC.,

      Defendant.
_____/

### ORDER ON DEFENDANT'S MOTION TO DISMISS

This is a *qui tam* action in which Plaintiff/Relator Thomas Bingham sues on his own behalf, and on behalf of the United States and the State of Florida, under 31 U.S.C. § 3730 of the False Claims Act ("FCA") and the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.* He alleges Defendant HCA, Inc. ("HCA") paid unlawful remuneration to referring physicians in violation of both the Stark Statute, 42 U.S.C. § 1395nn, and the Anti-Kickback Statute, 42 U.S.C. § 1320a–7b(b).

I have jurisdiction under 31 U.S.C. §§ 3732(a) and (b), and 28 U.S.C. § 1359.

Pending is HCA's Omnibus Motion to Dismiss Aventura-Based Allegations and Strike Impermissible Facts. (ECF No. 152). For the reasons that I follow, I **GRANT** the motion.

### BACKGROUND

Because I already have extensively, indeed, exhaustively summarized the factual background of this case in prior orders, I recite it only briefly here. *See, e.g., United States of America and the State of Florida ex rel. Thomas Bingham v. HCA, Inc.*, 2016 WL 344887, at *1-5 (S.D. Fla. Jan. 28, 2016).[1]

---

[1] On January 28, 2016, I granted in part HCA's motion to dismiss the First Amended Complaint, dismissing all claims related to Aventura with leave to amend, but allowing claims related to Centerpoint Medical Center ("Centerpoint") to proceed. Bingham thereafter filed a Second

HCA is a national health care services provider. *Id.* at *1. It owns and operates the Aventura Hospital and Medical Center ("AHMC"), which includes the Aventura Hospital, a 407 bed for-profit general medical and surgical hospital in Aventura, Florida. *Id.* HCA also owns, among other companies, Miami Beach Healthcare Group, Ltd. ("MBHG"). *Id.*

Bingham, a Tennessee-based "Certified General Real Estate Appraiser" claims to be an "insider" with respect to his knowledge of the alleged scheme discussed herein because HCA has previously been a client of his employer, "one of the country's largest third-party property management firms for medical office buildings." *Id.* He says he employed his "special skills as a commercial real estate appraiser to reveal the fraud scheme alleged in [the] Complaint." *Id.*

The alleged scheme at issue involves the Aventura Hospital. *Id.* at *4. Aventura Hospital provides inpatient and outpatient services to patients covered by federal and state sponsored health care programs, including Medicare, Medicaid, and Tricair. *Id.* The Aventura Heart & Health Building ("AHHB") is a multi-tenant medical office building located on the AHMC campus. *Id.*

Prior to the construction of AHHB, HCA had to obtain site plan approval from the City of Aventura, which included the approval of plans to meet the parking requirements for medical offices. *Id.* HCA, through its wholly-owned entity MBHG, executed a non-exclusive cross-parking agreement granting all present and future owners and tenants at AHHB, including their employees, agents, guests, and invitees, a non-exclusive right to use all parking spaces at AHMC, excluding Aventura Hospital's parking spaces. *Id.*

The Greenfield Group, a real estate developer, served as HCA's consultant for the two-phase medical office building and parking garage development project. *Id.* The estimated cost of constructing the parking structure was approximately $15 to $20 million. *Id.* On April 12, 2005, various documents related to the medical office building and parking garage project were simultaneously recorded in the public records of Miami-Dade County, Florida. *Id.* The recorded documents included the following: (1) Memorandum of Lease Agreement ("Memorandum") between with MBHG and RTH Partners, LLLP ("RTH

---

Amended Complaint ("SAC") on March 8, 2016, hoping to cure the infirmities of his Aventura-related claims. (ECF No. 104).

2

Partners") [2] that detailed the specifics of the 99 year ground lease; (2) Declaration of Covenants, Restrictions, and Easements ("Declaration"), listing MBHG as the Declarant and granting the medical office building parcel owner a perpetual nonexclusive right and easement to use the parking facilities on the AHMC campus; (3) Declaration of Connector Easements, listing with MBHG as the Declarant and granting the medical office building parcel owner a perpetual nonexclusive right and easement for pedestrian ingress and egress to and from the garage, which was located on the AHMC campus; (4) Memorandum of Lease Agreement, listing RTH Partners as the landlord and MBHG as the tenant and summarizing some of the basic terms of an unrecorded office space lease in the AHHB between RTH Partners and with MBHG; and (5) Consent of Fee Mortgage on Fee Simple Estate, recorded by with MBHG *Id.*

Construction of the AHHB began in April 2005 and completed in February 2006. *Id.* RTH Partners then began interior tenant build-outs for physician tenants who Bingham alleges are patient referral sources for Aventura Hospital. *Id.* These interior build-outs completed in April 2007. *Id..*

In October 2007, RTH Partners sold its interest in AHHB and its leasehold interest in the ninety-nine year medical office ground lease to VG Aventura MOB, LLC ("Ventas") for approximately $25.4 million. *Id.* Bingham alleges that RTH Partners sold the property for a substantial gain because the site value for the land necessary to build the AHHB and the requisite parking structure would have been approximately $4,170,000, and the portion of the garage needed for the AHHB to comply with parking standards would have cost approximately $5,250,000, for a total amount of $9,420,000. *Id.* Because HCA and RTH Partners did not negotiate their lease terms at arm's length, however, Bingham alleges that RTH Partners paid MBHG less than $2 million for the ground lease. *Id.* Additionally, RTH Partners entered into a long-term lease with MBHG for 22,000 square feet of office space in the AHHB for well above fair market rental rate. *Id.*

Bingham alleges that physician tenants benefited from the arrangement between RTH Partners and MBHG because: (1) referring physicians had an equity interest in the

---

[2] In June 2004, William R. Greenfield, owner of the Greenfield Group, formed RTH Equity, LLC, a wholly-owned Greenfield Group entity. *Bingham v. HCA, Inc.*, 2016 WL 344887, at *4 n.1. In turn, RTH Equity, LLC formed RTH Partners, LLP, with RTH Equity, LLC listed as its general partner. *Id.*

AHHB and received portions of the gain generated from its sale to Ventas; and (2) referring physicians received free parking benefits for themselves and all patients, valued at between $9,600 and $13,000 per referring physician per year. *Id.* at *5.

Bingham thus claims that HCA, in violation of the Stark Statute and the Anti-Kickback Statute, "purposefully obscured the remuneration it paid to physicians to induce them to refer patients to HCA's hospitals," and later submitted fraudulent claims from those referrals to the government. (ECF No. 104 ¶ 2).

## STATUTORY FRAMEWORK

1. <u>Stark Statute</u>

The Stark Statute "prohibits doctors from referring Medicare patients to a hospital if those doctors have certain specified types of 'financial relationships' with that hospital," and also "prohibits that same hospital from presenting claims for payment to Medicare for any medical services it rendered to such patients." *United States ex rel. Mastej v. Health Mgmt. Assocs.*, 591 F. App'x 693, 698 (11th Cir. 2014). Section 1395nn(a)(2)(B), defines a "financial relationship" as a "compensation arrangement" between a physician and a hospital. Under the regulations implementing the Stark Statute, a "compensation arrangement" is "any arrangement involving any remuneration," and "remuneration" is "any payment or benefit, made directly or indirectly, overtly or covertly, in cash or in kind." 42 C.F.R. §§ 411.351, 411.354(c).

The Stark Statute prohibits direct and indirect compensation arrangements. A direct compensation arrangement "exists if remuneration passes between the referring physician . . . and the [hospital] without any intervening persons or entities." 42 C.F.R. § 411.354(c)(1). An indirect compensation arrangement exists if (1) remuneration passes through an "unbroken chain" between the referring physician and the hospital; (2) the "referring physician . . . receives aggregate compensation . . . that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the [hospital];" and (3) the hospital "has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician . . . receives [the described] aggregate compensation." 42 C.F.R. § 411.354(c)(2).

That said, not every compensation arrangement constitutes a prohibited financial relationship under the Stark Statute. For example, "indirect compensation arrangements do

4

not constitute a financial relationship if the compensation is (1) equal to the fair market value for services and items actually provided; (2) not determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician for the hospital; and (3) commercially reasonable." *United States v. All Children's Health Sys.*, 2013 WL 6054803, at *4 (M.D. Fla. Nov.15, 2013) (quoting 42 C.F.R. § 411.357(p)); *see also* 42 C.F.R. § 411.357(a) (describing a lease permitted under the Stark Statute).

2. <u>Anti-Kickback Statute</u>

Under the Anti-kickback Statute, a hospital commits a felony by financially inducing a physician to refer a Medicare patient. Specifically, 42 U.S.C. § 1320a–7b(b)(2) prohibits "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person [for medical services] for which payment may be made in whole or in part under a Federal health care program." The exceptions to the Anti-kickback Statute closely parallel the exceptions to the Stark Statute. *See* 42 C.F.R. § 1001.952(b) (describing a lease permitted under the Stark Statute).

3. <u>FCA</u>

"The False Claims Act is the primary law on which the federal government relies to recover losses caused by fraud." *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005). Under 31 U.S.C. § 3729(a)(1) and (a) (2), the False Claims Act imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Because compliance with both the Stark Statute and the Anti-Kickback Statute is a prerequisite for Medicare payments, a violation of either of those statutes can form the basis of liability under the False Claims Act.

## LEGAL STANDARD

To state a claim under the False Claims Act, Bingham must satisfy two pleading standards.

First, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This rule does not require

detailed factual allegations, but it demands more than an unadorned, conclusory accusation of harm. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must "plead all facts establishing an entitlement to relief with more than 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although it is axiomatic that the Court must accept as true all of the allegations contained in a complaint, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "[L]egal conclusions can provide the framework of a complaint, [but] they must be supported by factual allegations." *Id.* at 679.

A False Claims Act complaint also must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002). A complaint satisfies the particularity requirement of Rule 9(b) if it alleges "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (citing *Clausen*, 290 F.3d at 1310).

Generally, to plead the submission of a false claim with particularity, "a Relator must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result." *United States ex rel. Matheny v. Medco Health Sol., Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012). A plaintiff cannot merely "describe a private scheme in detail but then . . . allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311. Instead, "some *indicia of reliability* must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." *Id.* (emphasis added).

The Eleventh Circuit has recognized that while the requirements of Rule 9(b) may, in practice, make it difficult for a *qui tam* plaintiff to bring an action, they are necessary to prevent "[s]peculative suits against innocent actors for fraud" and charges of guilt by association. *Id.* at 1308.

6

## DISCUSSION

HCA argues, *inter alia*, that Bingham impermissibly uses information learned through discovery to supplement allegations in his Second Amended Complaint ("SAC"), and that without that information, the SAC is so threadbare as to warrant dismissal.[3] I agree.

The False Claims Act grants a right of action to private citizens if they have independently-obtained knowledge of fraud on the government. *See* 31 U.S.C. § 3730(e)(4); *U.S.* ex rel. *Osheroff v. Humana, Inc.*, 776 F.3d 805, 814 (11th Cir. 2015) (*qui tam* relator's "knowledge must have been direct and independent for the plaintiff to qualify as an original source"). It is well settled that a *qui tam* relator may not present general allegations in lieu of the details of actual false claims in the hope that such details will emerge through subsequent discovery. *United States* ex rel. *Keeler v. Eisai, Inc.*, 568 F. App'x 783, 805 (S.D. Fla. 2013). A special relaxing of Rule 9(b) would be a *qui tam* plaintiff's ticket to the discovery process that the statute itself does not contemplate.

Indeed, in *United States* ex. rel. *Clausen v. Laboratory Corp. of Am., Inc.*, 290 F.3d 1301 (11th Cir. 2002), the Eleventh Circuit warned of a situation where "a plaintiff does not specifically plead the minimum elements of their allegation, [and is able] to learn the complaint's bare essentials through discovery and may needlessly harm a defendants' goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements." *Id.* at 1313 n.24 (citation omitted). "This is especially so in cases involving the False Claims Act, which provides a windfall for the first person to file and permits recovery on behalf of the real victim, the Government." *Id.*

Allowing a *qui tam* relator to amend his or her complaint after conducting further discovery would mean that "the government will have been compelled to decide whether or not to intervene absent complete information about the relator's cause of action." John T. Boese, *Civil False Claims and Qui Tam Actions* § 4.04[C]. That result would be at odds with the

---

[3] HCA also argues: (1) the Public Disclosure Bar warrants dismissal of Bingham's Aventura-based allegations; (2) the SAC fails to allege violations of the FCA; and (3) the FCA's statute of limitations bars claims based on activity that occurred before October 10, 2007. (ECF No. 152). Because I base my ruling on the SAC's failure to satisfy the demanding pleading requirements of Rule 9(b), I need not address HCA's other arguments.

FCA's procedures for filing a *qui tam* action and its protections for the government.[4] *See United States* ex rel. *Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 231 (1st Cir. 2004), *abrogated in part on other grounds by United States* ex rel. *Einstein v. City of New York*, 556 U.S. 928 (2009).

Bingham's reliance on information learned through discovery to satisfy Rule 9(b) is therefore misplaced. Without that information, the SAC suffers from the same infirmities that led me to dismiss the Aventura allegations in the First Amended Complaint. *See* ECF No. 105 at 25-61 (redacted SAC). The remaining allegations do not set forth "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper*, 588 F.3d at 1324. Rather, they amount to conclusory accusations of wrongdoing lacking sufficient "indicia of reliability" to support Bingham's Aventura-related claims. *Clausen*, 290 F.3d at 1311. There is simply not enough detail for one "to conclude, without grossly speculating, that HCA did in fact submit false claims to the government for payment." *Bingham*, 2016 WL 344887, at *8.

In short, Bingham has failed to state a claim under the FCA with regard to the Aventura scheme.[5] HCA's motion is therefore granted.

## CONCLUSION

For the foregoing reasons, it is **ORDERED and ADJUDGED** that Defendant's Omnibus Motion to Dismiss Aventura-Based Allegations and Strike Impermissible Facts (ECF No. 152) is **GRANTED**. Bingham's Aventura-based allegations are dismissed with

---

[4] The reluctance to permit *qui tam* relators to use discovery to meet the requirements of Rule 9(b) reflects, in part, a concern that a *qui tam* plaintiff, who has suffered no injury in fact, may be particularly likely to file suit as "a pretext to uncover unknown wrongs." *United States* ex rel. *Robinson v. Northrop Corp.*, 149 F.R.D. 142 (N.D. Ill. 1993) (noting Rule 9(b)'s discouragement of pre-textual claims in rejecting special 9(b) treatment of a *qui tam* plaintiff).

[5] The Florida False Claims Act mirrors the federal False Claims Act and is subject to the same pleading standard. *See United States v. Adventist Health Sys./Sunbelt, Inc.*, 2012 WL 3105586, at *2 n.4 (M.D. Fla. July 30, 2012); *United States* ex rel. *Watine v. Cypress Health Sys. Fla ., Inc.*, 2012 WL 467894, at *1 (N.D. Fla. Feb.14, 2012).

prejudice and all facts learned through discovery are stricken from the SAC.[6]

**DONE and ORDERED** in chambers at Miami, Florida, this 14th day of October 2016.

*(signature)*
MARCIA G. COOKE
United States District Judge

Copies provided to:
*Edwin G. Torres, U.S. Magistrate Judge*
*Counsel of Record*

---

[6] Under Fed. R. Civ. P. 12(f), a court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter," either on motion made by a party or *sua sponte*. Material learned through discovery is "immaterial" because it cannot cure an FCA complaint's failure to satisfy Rule 9(b). *See Clausen*, 290 F.3d at 1313 n.24.